**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

DARLENE GIBBS, STEPHANIE EDWARDS,          :
LULA WILLIAMS, PATRICK INSCHO,             :
and LAWRENCE MWETHUKU, *on behalf of*      :    Civil Action No. _____3:17-cv-386_____
*themselves and all individuals similarly situated*, :
                                           :
                      Plaintiffs,          :
                                           :
                                           :
v.                                         :
                                           :
KENNETH REES; THINK FINANCE, INC.;         :
THINK FINANCE SPV, LLC; TC DECISION        :
SCIENCES, LLC; TC LOAN SERVICE, LLC;       :
TAILWIND MARKETING, LLC; and               :
GPL SERVICING,                             :
                                           :
                      Defendants.          :
_____ :

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs, Darlene Gibbs, Stephanie Edwards, Lula Williams, Patrick

Inscho, and Lawrence Mwethuku ("Plaintiffs"), *on behalf of all individuals similarly situated*, by

counsel, and for their Class Action Complaint against Defendants, they allege as follows:

### INTRODUCTION

1.      Like many other states, Virginia enacted usury laws that prohibit companies from

making high interest loans. The prohibition against the making of unethical monetary loans is not

a modern principle; indeed, "[f]or nearly three-hundred years, American states were nearly

unanimous in their prohibition of usurious lending through double—or even single-digit interest

rate caps." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid*

*Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 (2012). With roots as ancient

as the Bible, usury laws reflect society's *longstanding* view that it is unethical and, thus, illegal to

charge excessive interest rates—a view hammered home by a variety of jurisdictions who have criminalized this conduct, including Virginia. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); *see also* Peterson, *supra*, at 896, 899; Robin A. Morris, *Consumer Debt and Usury: A New Rationale for Usury*, 15 Pepp. L. Rev. 151, 151 (1988) (explaining that usury laws are "society's oldest continuous form of commercial regulation").

2.      In an attempt to circumvent state and federal lending laws, Defendant Kenneth Rees approached members of the Chippewa Cree Tribe and Otoe-Missouria Tribe (collectively the "Tribes") for the purpose of establishing separate "rent-a-tribe" enterprises. Beginning in 2011, Defendants established and controlled the operations of Plain Green, LLC ("Plain Green"), and Great Plains, LLC ("Great Plains")—the tribal enterprises that served as fronts to disguise Rees and his companies' roles to and ostensibly shield the scheme from liability through a "rent-a-tribe" structure that attempted to exploit Indian Tribal Sovereign Immunity.[1] Pursuant to this scheme, Defendants made loans in Virginia with annual percentage rates in excess of 400%—more than 30 times the 12% interest cap in Virginia for companies that are not licensed by the Virginia State Corporation Commission (the "Commission"). *See* Va. Code § 6.2-303(A).

3.      Based on Defendants' conduct, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants acted in concert and conspired with each other to repeatedly violate federal and state lending statutes

---

[1] *See Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (explaining that "tribal immunity has also been exploited in new areas that are often heavily regulated by States. For instance, payday lenders (companies that lend consumers short-term advances on paychecks at interest rates that can reach upwards of 1,000 percent per annum) often arrange to share fees or profits with tribes so they can use tribal immunity as a shield for conduct of questionable legality." (citing Martin & Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012))).

resulting in the collection of an unlawful debt from Plaintiffs and the class members. Defendants are "persons" as defined in 18 U.S.C. § 1961(3), and the usurious debts they sought to collect and did collect are "unlawful debts" under 18 U.S.C. § 1961(6). Defendants' acts described herein are unlawful as set forth in 18 U.S.C. § 1962.

4.      Plaintiffs also seek a declaratory judgment that the loan agreements related to Defendants' rent-a-tribe scheme are void and unenforceable. If a company makes a loan without a consumer finance license, Virginia law provides that the "loan contract *shall be void*" if it contains an interest rate above 12%. Va. Code. § 6.2-1541(A) (emphasis added). Defendants' loan agreements not only violate Va. Code. § 6.2-1541(A), but they also contain unconscionable choice of law and arbitration provisions that seek to disclaim all federal and state laws in favor of "tribal law." These unconscionable provisions also render the loan agreements void and unenforceable as a matter of public policy. On two recent occasions, including a case involving the Great Plains' loan agreement at issue in this case, the Fourth Circuit held that similar provisions were unenforceable for violating public policy.[2]

5.      Plaintiffs also assert a class claim for violations of Virginia's usury laws. Because the loans exceed 12% annual percentage rate ("APR"), such loans are null and void and neither the lender nor any third party may collect, obtain, or receive any principal, interest, or charges on

---

[2] *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016) ("This arbitration agreement fails for the fundamental reason that it purports to renounce wholesale the application of any federal law to plaintiffs' federal claims."); *Dillon v. BMO Harris Bank, N.A.*, 2017 WL 1903475, at *4 (4th Cir. 2017) ("We hold that the above provisions . . . are not distinguishable in substance from the related provisions . . . we held unenforceable in *Hayes*. The arbitration agreement in this case implicitly accomplishes what the Western Sky Agreement explicated stated, namely, that the arbitrator shall allow for the application of any law other than tribal law. Just as we did in *Hayes*, we interpret these terms in the arbitration agreement as an unambiguous attempt to apply tribal law *to the exclusion of federal and state law*.").

the loans. 15 U.S.C. § 1541(A). Accordingly, Plaintiffs and the class members seek to disgorge all amounts paid by Virginia consumers in excess of 12%, plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorneys' fees and costs. Va. Code § 6.2-305(A).

## JURISDICTION

6.      This Court has jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover,  the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiffs Darlene Gibbs and Lula Williams are residents of this District and Division and a substantial part of Plaintiffs' claims occurred in Virginia.

## PARTIES

8.      Plaintiff Darlene Gibbs ("Gibbs") is a natural person and resident of the Richmond Division.

9.      Plaintiff Stephanie Edwards ("Edwards") is a natural person and resident of the Commonwealth of Virginia.

10.      Plaintiff Lula Williams ("Williams") is a natural person and resident of the Richmond Division.

11.      Plaintiff Patrick Inscho ("Inscho") is a natural person and resident of the Commonwealth of Virginia.

12.      Plaintiff Lawrence Mwethuku ("Mwethuku") is a natural person and resident of the Commonwealth of Virginia.

13.     Defendant Kenneth Rees ("Rees") is a natural person and resident of the state of Texas. At all times relevant, Rees was the president and chief executive officer of Defendant Think Finance, Inc. ("Think Finance"), which Rees set up to make and collect on the usurious loans. Rees is also the founder, chief executive officer, and sole registered member of Tailwind Marketing, LLC ("Tailwind Marketing") and TC Decisions, LLC ("TC Decisions").

14.     Think Finance is a Delaware corporation with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001. As explained below, Rees and others created Think Finance to locate, arrange and funnel the lending capital to the Tribes used to make the usurious loans to Virginia consumers. Although the Tribes held themselves out as the actual lender of these internet loans, Think Finance was the actual entity that procured the investment capital for Plain Green and Great Plains. Additionally, Think Finance initially performed the application processing, underwriting, and customer service support for the loans, but some of these tasks were later delegated to the other companies identified herein. Upon information and belief, after several lawsuits were filed against Think Finance, Rees conveyed all of the assets and responsibilities of Think Finance to Defendant Think Finance SPV, LLC ("Think Finance SPV"). Think Finance now serves as a holding company for Think Finance SPV in an effort to avoid liability for the illegal loans made to consumers.

15.     Think Finance SPV is a limited liability company formed under the laws of Delaware with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. According for the Application for Registration submitted to Secretary of State of Texas, Think Finance SPV's stated business purpose is "managing, marketing, making, and servicing consumer credit products." This document was signed by Rees as president.

16.     Tailwind Marketing is a limited liability company with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. As explained below, Tailwind participated in the enterprise as the marketing and technology arm to disguise the involvement of Rees and Think Finance. According to the Application for Registration submitted to the Secretary of State of Texas in 2008, Tailwind Marketing's stated business purpose was to "provide marketing and consumer financial services." This Application for Registration was signed by Rees as "the President of TC Loan Service, LLC," the Sole Member of Tailwind Marketing.

17.     TC Loan Services, LLC ("TC Loan Services") is a limited liability with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232. TC Loan Services participated in the enterprise as the controlling member of Tailwind Marketing. TC Loan Services was created to further insulate Defendants from liability by adding an extra layer of corporate protection to the misconduct of Tailwind Marketing.

18.     Defendant TC Decision Sciences, LLC ("TC Decision Sciences"), is a Delaware corporation with a principal place of business at 5080 Spectrum Drive, Suite 700 West Addison, TX 75001-3232.  As explained below, TC Decision Sciences participated in the enterprise as the website operator and software administrator for Plain Green and Great Plains.

19.     Defendant GPL Servicing ("GPLS") is a foreign corporation incorporated under the laws of the Cayman Islands. After the loans were originated, they were assigned within two days to GPLS for the purpose of servicing and collection. Upon information and belief, GPLS is owned by Rees, Think Finance and several other individuals who incorporated the collection arm of the operation in the Cayman Islands in further attempts to avoid legal liability.

## FACTUAL BACKGROUND

**A.      Virginia's Restrictions on High Interest Rate Lending.**

20.      Like many other states, Virginia has enacted usury laws that prohibit companies from making high interest loans.

21.      Va. Code § 6.2-1501(A) provides that "[n]o person shall engage in the business of making loans to individuals for personal, family, household, or other nonbusiness purposes" and that, "in connection with any loan," no person shall charge interest "greater than the interest permitted by § 6.2-303" unless the person obtains a license from the Commission. Va. Code § 6.2-1501(A).

22.      Va. Code § 6.2-303(A) establishes an interest rate cap of 12% APR. Va. Code § 6.2-303(A) ("Except as otherwise permitted by law, no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year.").

23.      Taken together, Va. Code §§ 6.2-1501(A) and 6.2-303(A) establish that a person must obtain a consumer finance license in order to charge interest in excess of 12%.

24.      The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants.

25.      In order to qualify for a consumer finance license, a person must have a physical location in Virginia and liquid assets of at least $50,000 if the specified location is in a Virginia city or county with a population of more than 20,000, or at least $25,000 if it is in a county with a population of less than 20,000. Va. Code § 6.2-1507(A)(2).

26.      Consumer finance licensing requirements further protect consumers because, before granting a license, the Commission must make a finding that: (1) "an applicant, and its directors, senior officers and principals have the financial responsibility, character, experience and

general fitness to command the confidence of the public and to warrant belief that the business will be operated lawfully, honestly, fairly and efficiently" and (2) that the applicant "is knowledgeable of the business and familiar with Virginia laws and regulations and applicable federal laws." Va. Code § 6.2-1507; *see also Application Forms – Consumer Finance Companies*, Virginia State Corporation Commission, https://www.scc.virginia.gov/bfi/applic/consfin.aspx (last visited Apr. 4, 2017).

**B.     Overview of Defendants' Enterprise.**

27.     RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals *associated in fact* although not a legal entity." 18 U.S.C. § 1691(4) (emphasis added).

28.     The Supreme Court has held that an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 (1981).

29.     Defendants Rees, Think Finance, Think Finance SPV, TC Decision Sciences, TC Loan Service, Tailwind Marketing, and GPLS worked together for the common purpose of making and collecting the usurious loans through the enterprises of Plain Green and Great Plains.

30.     Rees established the plan and strategy to create each of these entities and established their role in the making, marketing, and collection of the high-interest loans under the disguise of Plain Green and Great Plains.[3]

---

[3] Most of the facts from this section are taken from the Amended Complaint filed by the Attorney General for the Commonwealth of Pennsylvania against Rees, Think Finance, Tailwind Marketing, and TC Decisions. *Commonwealth of Pennsylvania v. Think Finance, Inc.*, Case No. 2:14-cv-07139(JCJ) (E.D. Pa.) (Am. Compl., Dkt. No. 57); *see also* Ben Walsh, *Outlawed By The States, Payday Lenders Take Refuge on Reservations,* Huffington Post (June 29, 2015, updated Sept.    8,    2015),    http://www.huffingtonpost.com/2015/06/29/online-payday-lenders-reservations_n_7625006.html.

31.     As chief executive officer of Think Finance and the sole member of several of the other affiliated entities, Rees intentionally directed and personally participated in the creation, management, and operations of the tribal lending enterprises.

32.     Prior to rebranding itself in 2010, Think Finance was known as ThinkCash, Inc., and it operated as an online payday lending website rather than through a "brick and mortar" lending store. Rees was the chief executive officer of Think Cash.

33.     Prior to establishing the rent-a-tribe scheme, Defendants were participating in a "rent-a-bank" scheme.

34.     Under the rent-a-bank model, a payday lender who was prohibited from making loans in a particular state would evade a state's lending restrictions by partnering with a bank that would act as a conduit for the loan in exchange for a fee.

35.     Beginning in 2005, the Federal Deposit and Insurance Corporation began cracking down on rent-a-bank arrangements, and the rent-a-bank arrangements were nearly eliminated by 2010—largely by the assessment of penalties and fines against participating banks.

36.     In response, Rees developed a solution—he decided to exploit Native American tribes as the new mechanism to continue the scheme. Ben Walsh, *supra* note 3, at 2 ("But by 2010, various federal regulators had all but shut down the [rent-a-bank] arrangement. Rees needed a new way to keep his business alive. The solution he found was relatively straightforward: He'd work with Native American tribes . . . .").

37.     Like the rent-a-bank format, the loans would be originated in the name of a tribe, but the tribe would serve as nothing more than a nominal lender.

38.     In early 2011, Rees sent a letter to the Chippewa Cree Tribe proposing that they participate in the joint lending venture.

39.     According to one tribal leader, "Think Finance made it clear to the Chippewa Cree that if the Tribe didn't accept Think Finance's terms, the company would be perfectly happy to find another tribe that would." *Id*. at 3.

40.     Within two weeks of receiving Rees' letter, the Chippewa Cree Tribe agreed to participate in the lending scheme and formed Plain Green. *Id*.

41.     Under the scheme, loans are made in the name of Plain Green, but Defendants provide the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: lead generation, technology platforms, payment processing, and collection procedures.

42.     Pursuant to the initial contract between the various entities, Think Finance agreed "to license its software to the Tribe pursuant to a software license agreement acceptable to the parties" and to also "provide risk management, application processing, underwriting assistance, payment processing, and ongoing customer service support coterminous with the software license agreement." (Mar. 11, 2011 Term Sheet, attached as Ex. 1).

43.      Once the loan agreement was executed by a consumer, Plain Green immediately assigned the promissory note to GPLS for nothing of value.

44.     As compensation for serving as the front to allow Defendants to attempt to evade state licensure and to exploit Indian Tribal Sovereign Immunity, GPLS paid the Tribe 4.5% of the cash revenue received on the loans, reimbursed all expenses, and advanced the Tribe $50,000. *Id*.

45.     Upon information and belief, the Tribes have no control over the income or expenses of Plain Green and Great Plains and have no entitlement to the profits of the companies except for the nominal, 4.5% flat-fee paid pursuant to the Term Sheet. *See also* Ben Walsh, *supra* note 3, at 3 ("Although [Plain Green] is nominally owned by the Chippewa Cree, the tribe has little

actual involvement in its operations and receives a tiny fraction of the revenue generated by the business.").

46.     Shortly after entering into the rent-a-tribe arrangement with the Chippewa Cree Tribe, Rees contacted the Otoe-Missouria Tribe in Oklahoma, who agreed to participate in the lending scheme and formed Great Plains.

47.     Upon information and belief, the Great Plains enterprise is virtually identical to the structure of Plain Green.

48.     Thus, although Plain Green and Great Plains held themselves out as the actual lenders of these internet payday loans, Defendants marketed, funded, collected the loans, and controlled the day-to-day operations and major business decisions of Plain Green and Great Plains.

49.     Upon information and belief, the money loaned to Plaintiffs was transferred from a bank account owned and operated or controlled by Think Finance and Rees even though Plain Green and Great Plains concealed this information from consumers.

50.     Furthermore, neither Plain Green nor Great Plains ever accepted consumer payments after the loan agreement was executed.

51.     Rather, all payments went to GPLS—a Cayman company owned by Rees and others in order to avoid liability.

52.     Rees also established Tailwind Marketing, who participated in the enterprise as the marketing and solicitation arm to disguise the involvement of Rees and Think Finance.

53.     Upon information and belief, pursuant to a Marketing Agreement executed amongst the affiliated entities described herein, Tailwind Marketing handled the online and other

advertisements for Plain Green and Great Plains. Tailwind Marketing also handled the lead generation used to identify and solicit potential consumers.[4]

54.     According to discovery uncovered by the Pennsylvania Attorney General, Tailwind received $100 for every borrower provided to Plain Green.

55.     Upon information and belief, Tailwind also received $100 for every borrower provided to Great Plains, and, ultimately, this money ended up back in the pocket of Rees through his ownership interest in Tailwind.

56.     Similarly, pursuant to a Servicing Agreement executed amongst the affiliated entities described herein, TC Decision Sciences participated in the enterprises as the website operator and software administrator for Plain Green and Great Plains.

57.     As part of this role, TC Decision Sciences also handled customer service responsibilities, such as communications with consumers under the guise of Plain Green and Great Plains.

58.     Upon information and belief, TC Decision received $5 a month for each active account with Plain Green and Great Plains, and, again, this money ended up back in the pocket of Rees through his ownership interest in TC Decision Sciences.

59.     Because of their roles in the enterprises, the Attorney General for the Commonwealth of Pennsylvania brought an enforcement action against Rees and most of the entities named herein. *Commonwealth of Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *1

---

[4] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), http://www.pewtrusts.org/~/media/assets/2014/10/payday-lending-report/fraud_and_abuse_online_harmful_practices_in_internet_payday_lending.pdf.     Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id.*

(E.D. Pa. Jan. 14, 2016) (denying Rees, Think Finance, and other defendants' motion to dismiss alleged violations of Pennsylvania and federal laws prohibiting usurious and illegal lending practices).

60.     Upon information and belief, after the Pennsylvania Attorney General filed the lawsuit against Defendants, Rees conveyed all of the assets and responsibilities of Think Finance to Think Finance SPV. Think Finance now serves as a holding company for Think Finance SPV in an effort to avoid liability for the illegal loans made to consumers.

61.     The Pennsylvania Attorney General is not alone in its attention to this unlawful business model. For example, the United States Attorney for the Southern District of New York has indicted Scott Tucker and Timothy Muir, competitors of Defendants, for engaging in exactly the same unlawful-lending "rent a tribe" and collection practices alleged herein.

62.     The Tucker indictment, which sets out a strikingly similar set of facts, includes: (1) Mr. Tucker, through the use of shell companies, personally lent money to thousands of consumers through payday loans; (2) Tucker personally controlled virtually every aspect of the operations of these sham entities; (3) these sham entities shared employees, computer systems, and "other operating costs and infrastructure of a single lending business"; and (4) Mr. Muir acted as general counsel for one of the Tucker entities. *United States v. Tucker*, Case No. 16-crim-091 (S.D. N.Y. Feb. 9, 2016) (Dkt. 1 at ¶¶ 1–3.)

63.     For example, the indictment explains:

> In truth and in fact, as SCOTT TUCKER and TIMOTHY MUIR, the defendants, well knew, while TUCKER and MUIR took steps to create the sham appearance of tribal ownership and control of the Tucker Payday Lenders, Tribes 1–3 played no substantive role in the ownership or operation of the Tucker Payday Lenders at any time. To create the sham appearance of ownership, TUCKER assigned nominal ownership of the Tucker Payday Lenders to Tribes 1-3 (that is, Ameriloan, United Cash Loans, US Fast Cash, Advantage Cash Services and Star Cash Processing were assigned to Tribe 1, One Click Cash was assigned to Tribe 2, and 500 Fast

Cash was assigned to Tribe 3), and from time to time caused Tribes 1-3 to appear as the businesses' owners on certain corporate and financial documents. However, in truth and in fact, at all relevant times, and as TUCKER and MUIR well knew, Tribes 1-3 had no power to make any decisions on behalf of any of the Tucker Payday Lenders, no control over the income or expenses of any of the Tucker Payday Lenders, and no entitlement to the Tucker Payday Lenders' profits.

Similarly, to create the sham appearance that Tribes 1–3 not only owned, but operated, the Tucker Payday Lenders, SCOTT TUCKER, the defendant, caused members of two of the tribes (Tribe 1 and Tribe 2) to have a tribal member press a key on a computer on a daily basis on tribal lands to purportedly "approve" the extension of credit on hundreds or thousands of loans that the Tucker Payday Lenders, through their approximately 600 employees in Kansas, had in fact already approved and agreed to provide to customers. TUCKER did not require a third tribe that purportedly owned and operated one of the Tucker Payday Lenders (Tribe 3) to engage in this sham participation in the operations of his business at all.

*Id*. at ¶¶ 23-24.

64.     Just like the Tucker defendants, Defendants' business relationship with the Native American tribes was nothing more than a failed attempt to shield their illegitimate businesses with the protection of tribal immunity.

65.     Most, if not all, activities performed in connection with the loans are performed by Defendants' employees and not on the reservations—often located in Georgia, Pennsylvania, and Texas. Ben Walsh, *supra* note 3, at 10.

66.     Indeed, the Plain Green Loan Agreement expressly instructs consumers to "mail each payment payable to Plain Green, LLC, Payment Processing, PO Box 42560, Philadelphia, PA 19101." (Jan. 6, 2016 Loan Agreement, attached as Ex. 2).

## C.     Defendants' Loans Charged Interest in Violation of Va. Code § 6.2-1541 and RICO.

67.     Defendants, together with other members of the Enterprise and individuals not yet known to Plaintiffs, marketed, initiated, and collected usurious loans in Virginia.

68.     Plaintiffs obtained loans in the amounts ranging from $300- $3,000 from Defendants.

69.     In order to qualify for Defendants' loan product, consumers were required to electronically sign a form contract entitled "Plain Green Installment Loan Agreement" or "Great Plains Installment Loan Agreement."

70.     All loans offered by Defendants through Plain Green and Great Plains contained interest rates from 118% to 448%, if not higher.

71.     For example, Gibbs' interest rate was 277.92%; Williams' interest rate was 247.88%. *Id.*

72.     Absent several exceptions, Va. Code § 6.2-1541 prohibits any person from making such loans to Virginians in excess of 12% APR unless that company has obtained a consumer finance license from the Commission. *See* Va. Code § 6.2-1501.

73.     Neither Defendants nor Plain Green or Great Plains had a consumer finance license when they made the loans to Plaintiffs; nor did they ever attempted to obtain such a license.

74.     Under Va. Code § 6.2-1541(A), if a lender was not exempt from the provisions of those statutes and had not obtained a consumer finance license, yet nonetheless contracted to make a consumer loan and charged, contracted for, or received, interest, or other compensation in excess of 12% per year, then the loan is null and void, and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

75.     Accordingly, Defendants' loans were null and void, and it was unlawful for Defendants or any of their affiliated entities to collect or receive any principal, interest, or charges on the loans, including the amounts paid by Plaintiffs.

76.     Defendants received no less than $566.82 from Ms. Gibbs as a result of her illegal loan—most of which Defendants credited as payment for interest or other fees.

77.     Defendants received no less than $15,399.04 from Ms. Edwards as a result of her illegal loans—most of which Defendants credited as payment for interest or other fees.

78.     Defendants received no less than $1,774.56  from Ms. Williams as a result of her illegal loan—most of which Defendants credited as payment for interest or other fees.

79.     Defendants received no less than $1,764.56 from Mr. Mwethuku as a result of his illegal loan—most of which Defendants credited as payment for interest or other fees.

80.     Defendants received no less than $1,048.53 from Mr. Inscho as a result of his illegal loan—most of which Defendants credited as payment for interest or other fees.

81.     Pursuant to Va. Code § 6.2-305(A), Plaintiffs and the class members are entitled to twice the total amount of interest paid on these loans.

82.     Defendants' conduct also violated § 1962(c) of RICO, which prohibits the "collection of unlawful debt." 18 U.S.C. § 1962(c).

83.     RICO defines "unlawful debt" as a debt that was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

84.     Defendants charged an interest rate far in excess of the enforceable rate established by Va. Code § 6.2-1541(A), and, thus, Defendants violated RICO's prohibition against the collection of unlawful debt.

85.     As a result of Defendants' participation in the Enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**D.      The Loan Agreements Are Void and Unenforceable.**

86.      Because the loans were made without a consumer finance license, the agreements were void *ab initio* under Virginia law. Va. Code. § 6.2-1541(A) ("A loan contract shall be void if any act has been done in the making or collection thereof that violates § 6.2-1501.").

87.      Accordingly, Plaintiffs seeks a declaratory judgment that Plaintiffs and the class members' loans are void and that they no longer owe any amounts under their loans.

88.      Defendants' loan agreements not only violate Virginia's public policy against usurious loans, but they also contain unconscionable choice of law and arbitration provisions that seek to disclaim all federal and state laws in favor of tribal law.

89.      In particular, Plain Green's Agreement provides:

Plain Green's inclusion of these disclosures does not mean that Plain Green consents to the application of state or federal law to Plain Green, the Loan, or this Agreement.

…

This Agreement and the Agreement to Arbitrate are governed by Tribal Law. The Agreement to Arbitrate also comprehends the application of the Federal Arbitration Act, as provided below. Plain Green does not have a presence in Montana or any other state of the United States of America. Neither this Agreement nor the Plain Green is subject to the laws of any state of the United States. Plain Green may voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the Chippewa Cree Tribe to any federal law unless found expressly applicable to the operations of the Chippewa Cree Tribe.

(Ex. 2 at 6).

90.      Great Plains' Loan Agreements contain similar provisions indicating:

This Agreement and the Agreement to Arbitrate are governed by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the Constitution of the United States of America. We do not have a presence in Oklahoma or any other state of the United States of America. Neither this Agreement nor the Lender is subject to the laws of any state of the United States. The Lender may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence of the

Otoe-Missouria Tribe to any federal law unless found expressly applicable to the operations of the Otoe-Missouria Tribe.

(Ex. 3 at 7).

91.     Just like the defendants in *Hayes*, Rees and his affiliated entities attempted to avoid federal and state laws through the use of unconscionable and unenforceable choice-of-law, forum selection, and arbitration provisions.

92.     In finding a nearly identical provisions unenforceable in *Hayes*, the Fourth Circuit explained, "We recognize that the FAA establishes a 'liberal policy favoring arbitration agreements.' But rather than use arbitration as a just and efficient means of dispute resolution, [the defendant] seeks to deploy it to avoid state and federal law and to game the entire system." *Hayes*, 811 F.3d at 676 (internal citations omitted).

93.     Over a year later, the Fourth Circuit reaffirmed the *Hayes* decision in a case involving a Great Plains Loan Agreement. *Dillon*, 2017 WL 1903475, at *4.

94.     In doing so, the Fourth Circuit held that Great Plains' choice of law and arbitration provisions were "not distinguishable in substance from the related provisions" in *Hayes*, and it found that the agreement was "an unambiguous attempt to apply tribal law *to the exclusion of federal and state law.*" *Id.* (emphasis in original). Accordingly, the Fourth Circuit held "that the arbitration agreement between Dillon and Great Plains [was] unenforceable . . . ." *Id.* at 1.[5]

95.     Accordingly, Plaintiffs request the Court to enter a declaratory judgment that the governing law, forum selection, and arbitration provisions are unenforceable as to Virginia consumers.

---

[5] The plaintiff in *Dillon* was a North Carolina consumer who commenced a case against BMO Harris and several other financial institutions who facilitated the "collection of unlawful debts" through the electronic transfer of funds between financial institutions. *Dillon*, 2017 WL 1903475 at *1. Dillon did not seek any relief on behalf of Virginia consumer or against Rees, Think Finance, Think Finance SPV, Tailwind Marketing, TC Decisions, or GPLS.

96.     Plaintiffs further request the Court to enter an injunction prohibiting Defendants from collecting any amounts from Virginia consumers in connection with the loans, requiring Defendants to provide notice to consumers that the loans are unenforceable, and deleting any derogatory reporting on tradelines to the credit bureaus or other consumer reporting agencies.

**E.      Involvement and Personal Liability of Defendant Rees.**

97.     During the pertinent times, Rees was the architect of the lending scheme, participated in the day-to-day operations of the scheme, and controlled the businesses.

98.     Rees formed and used these companies, including Think Finance, Tailwind Marketing, GPLS, TC Loan Service, and TC Decisions, to engage in unfair, deceptive, and abusive acts that harmed Plaintiffs and the class members.

99.     Rees developed the strategy and role for each of the entities and the plan to perpetrate a nationwide scheme to collect full payment on small-dollar loans that state licensing and usury laws rendered wholly or partially void or uncollectible, including in Virginia.

100.    In 2011, Rees sent the letter to the Chippewa Cree Tribe offering it the opportunity to participate in the rent-a-tribe venture. This letter and subsequent communications involving Rees and members of the Tribe resulted in the Term Sheet signed in March 2011.

101.    Rees directly and actively managed the activities of Think Finance, Think Finance SPV, Tailwind Marketing, GPLS, TC Loan Service, and TC Decisions.

102.    Rees participated in and knew of the actions of Think Finance in Virginia, which are the subject of this lawsuit. Rees chose Virginia as a place where loans and collection efforts would ensue.

103.     Rees, during the pertinent times, was directly and materially involved in this intentional misconduct and knew the subject loan and debt collection scheme was illegal under Virginia law, but he pursued the scheme anyway via his companies.

104.     Upon information and belief, after the Pennsylvania Attorney General filed the lawsuit against Defendants, Rees conveyed all of the assets and responsibilities of Think Finance to Think Finance SPV. Think Finance now serves as a holding company for Think Finance SPV in an effort to avoid liability for the illegal loans made to consumers.

105.     Accordingly, Rees is jointly and severally liable for the claims herein by: (1) virtue of his direct personal involvement in the underlying fraudulent conduct and (2) as a result of the fraudulent transfer of Think Finance's assets.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

106.     Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

107.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Virginia RICO Class"—initially defined as:

> All Virginia residents who executed a loan with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after May 19, 2013.

Plaintiffs are members of the Virginia RICO Class.

108.     **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief and as reflected by the profits generated by Defendants, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

109.     **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).**

Common questions of law and fact exist as to all members of the putative class, and there are no

factual or legal issues that differ between the putative class members. These common questions

predominate over the questions affecting only individual class members. The common questions

include: (1) whether Plain Green and Great Plains constitute an "enterprise" under RICO; (2)

whether Rees, Think Finance, Think Finance SPV, TC Decision Sciences, TC Loan Service,

Tailwind Marketing, and GPLS participated in the enterprise; (3) whether the loans violated Va.

Code § 6.2-1501 because the interest rates were too high; and (4) what is the proper recovery for

Plaintiffs and the class members against each defendant.

110.     **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of

each putative class member. Plaintiffs are entitled to relief under the same causes of action as the

other members of the putative class. Additionally, Plaintiffs' claims are based on the same facts

and legal theories as each of the class members.

111.     **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate

representatives of the putative class because their interests coincide with, and are not antagonistic

to, the interests of the members of the class that they seek to represent. Plaintiffs have retained

counsel competent and experienced in such litigation, and they intend to continue to prosecute the

action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the

members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them

to not vigorously pursue this action.

112.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the

class members predominate over questions affecting only individual members, and a class action

is superior to other available methods for fair and efficient adjudication of the controversy. The

damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts.   Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

113.   **Injunctive Relief Appropriate for the Class.   Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiffs and the class members. Plaintiff and the putative class seek an injunction ordering Defendants to divest themselves of any interest in any enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in any enterprise pled herein; and ordering the dissolution of each Defendant that has engaged in any enterprise pled herein.

114.   As alleged above, Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(c) of RICO through the "collection of unlawful debt." 18 U.S.C. § 1962(c).

115.   RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

116.    All of the loans made to Virginia residents and collected by Defendants included an interest rate far in excess of twice the enforceable rate in Virginia.

117.    This conduct began sometime as early as 2011, continues to date, and will be repeated again and again in the future to the detriment of Virginia consumers.

118.    Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by Defendants.

## COUNT TWO:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
## (CLASS CLAIM AGAINST ALL DEFENDANTS)

119.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

120.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class, initially defined as:

> All Virginia residents who executed a loan with Plain Green or Great Plains where the loan was originated and/or any payment was made on or after May 19, 2013.

121.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical.  The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

122.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members.

123.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

124.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

125.   **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants acted on grounds generally applicable to the class, making appropriate equitable injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to divest themselves of any interest in the enterprise pled herein, including the receipt of racketeering profits; prohibiting Defendants from continuing to engage in the enterprise; and ordering the dissolution of each Defendant that has engaged in the enterprise.

126.   As alleged above, Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c), including the Term Sheet between the Chippewa Cree Tribe, Think Finance, GPLS and the contracts related to the services performed by Tailwind Marketing and TC Decision Sciences as part of their roles in the enterprise.

127.    As a result of Defendants' participation in the enterprise and violations of RICO, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE:**
**VIOLATIONS OF VIRGINIA USURY LAWS**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

128.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

129.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class initially defined as follows:

**Virginia Usury Class**: All Virginia residents who executed a loan with Plain Green or Great Plains where any interest was paid.

**Virginia Usury Subclass**: All Virginia residents who executed a loan with Plain Green or Great Plains where any interest was paid on or after May 17, 2015.

130.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

131.    Based on the estimated size of the class and the volume of loans offered by Defendants, Plaintiffs believe that the amount in controversy easily exceeds $5 million when considering the amounts repaid by Virginia borrowers, as well as the amount of outstanding debt that will be cancelled as part of the relief sought in this lawsuit.

132.    **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate

25

over the questions affecting only individual class members. The principal issues include: (1) whether the loans made by Defendants violated Virginia Code Section § 6.2-1501 because their interest levels were too high and (2) what is the proper recovery for Plaintiffs and the class members against each defendant.

133.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All claims are based on the same facts and legal theories.

134.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent. Plaintiffs have retained counsel competent and experienced in such litigation, and they intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests that might cause them to not vigorously pursue this action.

135.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay

and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

136.    All of the loans made by Defendants to Virginia consumers used an interest rate greater than 12% and none of the exceptions to Va. Code § 6.2-303 apply.

137.    Accordingly, Plaintiffs and the class Members are entitled to recover from Defendants an amount equal to the total amount of interest paid in excess of 12% plus twice the amount of such usurious interest that was paid in the two years preceding the filing of this action and their attorney's fees and costs. Va. Code § 6.2-305(A).

**COUNT FOUR:**
**DECLARATORY JUDGMENT**
**(CLASS CLAIM)**

138.    Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

139.    Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class and subclass initially defined as follows:

> **Declaratory Judgment Class**: All persons who: (1) executed a loan with Plain Green or Great Plains (2) when they resided or were located in Virginia, (3) which contained an interest rate greater than 12%.

> **Declaratory Judgment Subclass**: All persons who: (1) executed a loan with Plain Green or Great Plains (2) when they resided or were located in Virginia, (3) which contained a choice-of-law provision, arbitration provision, or forum selection clause similar or identical to Plaintiffs.

> Plaintiffs are members of the Declaratory Judgment Class and Subclass.

140.    **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and

addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

141.   **Predominance of Common Questions of Law and Fact**. **Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether the loan agreements are void under Va. Code. § 6.2-1541(A) and (2) whether the loan agreements are void as a matter of public policy.

142.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member.  In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

143.   **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class, because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue this action.

144.   **Superiority. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. Litigating the validity and enforceability of each loan agreement would prove burdensome and

expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

145.    Virginia law provides that the "loan contract shall be void" if it contains an interest rate above 12% and the company makes a loan without a consumer finance license. Va. Code. § 6.2-1541(A) (emphasis added).

146.    Defendants' loan agreements violated § 6.2-1541(A), and, thus, Plaintiffs seek a declaratory judgment that the loan agreements are void and unenforceable.

147.    Defendants' loan agreements not only violate Virginia's usury statutes, but they also contain unconscionable choice of law, forum-selection, and arbitration provisions that are void and unenforceable for public policy concerns.

148.    The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the Loan Agreements as well as the validity, if any, of the choice of law, forum-selection, and arbitration provisions

149.    Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

150.    Accordingly, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully move for entry of a declaratory judgment that the loan agreements are void and unenforceable pursuant to § 6.2-1541(A). In the alternative, Plaintiffs seek a declaratory judgment that the choice of law, forum-selection, and arbitration provisions are void and unenforceable as a matter of public policy.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that the Court enter judgment on behalf of themselves and the class they seek to represent against Defendants for:

A.    Certification for this matter to proceed as a class action;

B.    Declaratory, injunctive and damages relief as pled herein;

C.    Attorney's fees, litigation expenses and costs of suit; and

D.    Such other or further relief as the Court deems proper.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,
**PLAINTIFFS**

By:_____/s/ Kristi C. Kelly_____
Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
KELLY & CRANDALL, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyandcrandall.com
Email: aguzzo@kellyandcrandall.com

Leonard A. Bennett, Esq., VSB #37523
Craig C. Marchiando, Esq., VSB #89736
Elizabeth W. Hanes, Esq., VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA  23601
Telephone: (757) 930-3660

Facsimile: (757) 930-3662
Email:  lenbennett@clalegal.com
Email: craig@clalegal.com
Email: elizabeth@clalegal.com

James W. Speer, VSB#23046
VIRGINIA POVERTY LAW CENTER
919 E. Main Street, Suite 610
Richmond, VA 23219
(804) 782-9430
(804) 649-0974
Email: jay@vplc.org

*Counsel for Plaintiffs*